No. 22-10419. Ms. DeVete. May it please the court. Good morning. My name is Anna DeVete and I am here on behalf of the appellant Jonathan Guerra Blanco. The first issue that I think this court should address is the failure of the district court to have a castigar hearing when the government clearly breached their agreement. What happened in this case was that the defendant was charged with a crime that involved several violent videos. There's no question that violence was already known by everybody. These videos were videos that he disseminated. He did not make. He specifically disseminated them. As part of our agreement with the government, we entered into a castigar agreement. And I'd like to explain it or describe it as an expanded castigar agreement because it not only included the meetings between the prosecutor and the defendant, it also included the turning over of the defendant's passwords to enter numerous different electronic computers, telephones. This was done with the understanding and with a specific email that clarified that it would cover everything on the computer and it would only exclude violence. Our position is that the... Can I ask you just a prefatory question? With regard to castigar, it seems to me that even if you're right that castigar immunized the contents. Yes, sir. And even if you're right that the statements did not concern violence in any form. Let's just put those aside for the purposes of my question and assume it. Regardless of the answer to those two questions, you would be required to show that any error on the court's part would have been harmful. Wasn't the error here harmless because the district judge told us so? The district judge said, and I quote, even without the video, there's more than enough evidence to meet the governance burden in the case. Each of the three open source Jihad guys began with a preamble stating the open source Jihad is America's worst nightmare, et cetera, et cetera. The district judge said, even if you were right, it didn't matter because he would have done exactly the same thing. Doesn't that render any theoretical error harmless? No, Judge, we don't believe so because what we believe is that the court definitely took the facts of the video having to do with the evidence. I read what he said during the sentencing. He himself said that that was overwhelming evidence that showed that even that overwhelming evidence, I think, Judge, that once it's been open. Wasn't that reference to the other pieces of evidence? He may have mischaracterized the other pieces of evidence, but wasn't that directed to other body of evidence that was sufficient? Judge, our interpretation is that once the door's been open and once the judge heard this evidence, the harm and the prejudice already occurred. We believe that it, that even though the court attempted to say that they had heard sufficient evidence, what really drew the court to the decision it made was specifically the facts of the video of the attempt on the judge's life. I don't think that we can separate those. I think if we take that specific fact away, we do not have enough evidence. You yourself, Ms. DeVete, during the hearing, you yourself told the judge that the videos of Exhibit 1, 2, and 3 were very violent in and of themselves. Is it your position that those Exhibits 1, 2, and 3 are not sufficient? Yes, Judge. Our position is that, I don't want to confuse the term violent with what we need for the 12-point enhancement in this case. 1, 2, and 3 were not gained as a result of the castigar. If we set aside what was, we believe, illegally used and was obtained as a result of the castigar, we have three separate Exhibits that the government presented. Is it your position that Exhibits 1, 2, and 3 are not sufficient for the enhancement, the 12-point enhancement? Yes. Yes, ma'am. Because we believe, Judge, that they have to show specific intent. I think the court's been clear on that. It needs to show some sort of coercion on the part or to influence the government. We believe that 1, 2, and 3 were merely documents that the client was interpreting. The client did not make these Exhibits. Your client didn't just interpret them or translate them. He also uploaded them. Did he not, after he translated them? He did. He did upload them and... He uploaded them for the purposes of disseminating that information. He did, Judge, and we still... And you can see that that information that was disseminated was in fact terroristic material. We do believe that it was terroristic material in that it dealt with ISIS, and we agree that ISIS... It wasn't just dealt with ISIS. It wasn't just like go support ISIS. It was information on how to make a bomb, on how to, if you're a microbiologist, how to create anthrax, how to do a truck that would cause the most massive destruction for other individuals. Judge, and while we agree that he did interpret it and he did post it, the content of all three of those Exhibits do not in any way serve as a requirement for the 12-point enhancement. They were not made to influence... I think that when you look at the position of what he did, had he written these, had he been responsible for actually being the author, then it would have been a different situation, but he was not the author. What he translated, a document that had already been... Do we not have in the Chahalzi opinion, we specifically said that even benign motives are subject to the enhancement, correct? Yes, Judge, but we still believe, Judge, and there is a specific case that was cited in my brief, and it's a Second Circuit... And wasn't the point of disseminating that information, in fact, Exhibits 1, 2, and 3 talk about violent jihad, do they not? They do, ma'am. Okay, so is it your position that disseminating that information does not support or participate in terroristic activity? Judge, we believe that it does, but we don't believe that that is the standard for the 12-point enhancement. The fact that he was ISIS is a terrorist organization is definitely fulfilled. I think the second prong, or the prong where the court allows for this extraordinary enhancement, where a sentence goes from seven years to 360 months in jail, requires an additional element, and this court has considered it in several different cases. It considered it in U.S. What's the additional element that you believe is necessary? I think there's a specific intent requirement that specifically says that it was, and I'm going to read from the... That it was calculated to influence or affect the conduct of the government by either intimidation, coercion, or retaliation. Wasn't there... One of the additional exhibits, didn't it have some language indicating that if the methodology or plan was followed, it might lead to the resignation of the President of the United States? That evidence was evidence that the government added to their brief. It was not evidence that was relied upon by the district court judge, and it was never mentioned by the district court judge. What the government is attempting to do is introduce other evidence because they themselves agree that the evidence relied upon by the district court is insufficient for this specific enhancement. That document was not introduced at the sentencing hearing? It was. It was introduced, but the language that was specifically referred to by the government in that specific statement that this honorable court just made was not a document that... Was not a phrase that was considered by the court, and it was not listed in its specific decision. We believe its decision lacked the requisite intent needed by this defendant to get this enhancement. Help me with this. Yes, sir. You referenced the statute, 18 U.S. Code 2332BG5. It defines a federal crime of violence, a federal crime of terrorism this way. It's an offense that one, and this is what you cited, is calculated to influence or affect the conduct of a government by intimidation or coercion or, to the disjunctive, to retaliate against government conduct. And you said there was no evidence in this record to support that finding. Let me ask you about one piece of evidence in particular, and that was in Open Source Jihad 2. It states, and I quote, America is a terrorist state. It is about time Muslims wake up and pay back America what is due it. Would not that fall squarely into retaliation? What, after all, would you mean if you were saying it's time to pay back America for having done these terrorist things? Judge, our position is... Isn't that retaliation almost by definition? Well, because he did not author it and because he was not the person who made it and he merely interpreted, we believe that it doesn't qualify in that specific situation, Your Honor. Is it your view that he has to be the original, the originator of the materials and that his... I mean, when you translate a document, you are in essence providing that document, no matter who wrote it, to a different audience of a different understanding. You seem to be suggesting, maybe I'm wrong, but you seem to be suggesting that he needed to be the author of the original text and that merely translating or providing an interpretation and uploading it is not enough. Is that your position? Yes, Judge, and it is. It's based on U.S. v. Stewart. That is a Second Circuit Court case that I specifically cited. In that case, one of the defendants, Usari, Mohamed Usari, was an interpreter who was part of a legal team. And what this specific defendant did was he interpreted for the lawyer who was also charged in this case. And not only did he interpret, he disseminated information from the person who was in jail, which led to further violent acts. The court in that case said that he didn't have any specific intent to disseminate or to influence the government because his role was that of an interpreter. And as a matter of fact, not only did he not grant the enhancement, he also gave a significant downward variance in that case. And that person did more in the defense's opinion than Mr. Garibaldi. But here, he wasn't just an interpreter. He was an active participant and believer in the dissemination of this material. I mean, he was having communications with individuals, and when he was arrested, he was found in possession on his phone with communications that contained jihadi material. I mean, he also had an ISIS flag under his bed. He did. He did. And our position has always been judged that, and that's why he pled guilty, that he believed that he was somehow involved, that whether he was a member of ISIS or he had an allegiance to ISIS, but still we don't believe his allegiance to ISIS because ISIS is per se a terrorist organization, is sufficient to comply with that specific enhancement. Let me ask you just one final question before you sit down. I know you are over your time, but I want to talk just a little bit about the sentence so we can get your view on it and have the prosecutor address it when he comes up there. Tell me, in your own words, what mistake, what error did the district court make with regard to acceptance of responsibility as you see it? We believe that because the defendant did enter a plea in a timely manner, he did not get the benefit of the three-level reduction for acceptance of responsibility. We have cited a case that this court addressed, U.S. v. Rodriguez, where it remanded a case for the three-level acceptance of responsibility. The specific district court judge in this case has given a three-level acceptance of responsibility to a majority of the defendants, and I can't say all, but a large number of defendants whose guidelines are in excess of the statutory max. Is it your view that the district court, by Rodriguez, was required to give him three levels off the 240 months? No. That it was a matter of his discretion and his failure to exercise that discretion amounted to an abuse of discretion? Yes, we think it was his failure. Was it because he was required to? Because when I read your blue brief, I thought I read you to say under the circumstances of this case, he was obliged. No, sir. He was not required, but he was definitely required to consider it and to know that that was something that he could do when it was in his realm of possibilities when sentencing Mr. Garablanca. Didn't the district judge say that he was entitled to a variance of some degree for the acceptance of responsibility he otherwise would not get? Didn't he expressly say that? He said, Judge, that that in conjunction with Mr. Garra's medical condition that was also testified to extensively, his mental condition and a combination, his autism that the doctor testified about, I think he said the majority, he combined it based on all the mitigating circumstances that Mr. Garablanca suffered for, he would consider reducing. And he did based on that. But we still believe that he erred and not reduction. He varied for years. He did. Right. Yes, sir. And I guess your argument is that he had to explain what each variance was for each individual thing. No, he had to say, okay, for the mental health, I'm departing X number of months or levels for acceptance because he otherwise wouldn't get it. I'm varying X number of months or levels for all the other stuff, mitigation, I'm doing this. He had to break it down that sequentially? No, we don't believe he had to, but what we do think is that the court should have considered his acceptance of responsibility as a viable downward variance and then, which would have been three levels and would have brought this specific defendant down to, I think it's 15 years, 15.2 years. We believe that that's what the court should have done in this case. So if I understand it then, what you're now saying, and I confess it's not what you said in the blue brief initially, what you're now saying is the error the district court made was that he was required to consider the acceptance of responsibility for a departure, not a variance, and that when he lumped the two together under the category of variance, he made a mistake because he didn't understand that he really could have departed on one grounds and entered a variance on other grounds, but acceptance of responsibility fell under the heading of departure, not variance. Is that what you're now saying? Yes, sir. You didn't say that in the blue brief, though. I didn't say it eloquently enough. You didn't say it at all. Yes, sir. You do say it in the reply brief in response to the government's red brief where the government comes back and says, well, you haven't shown that the judge misapprehended, that he was laboring under the idea that he didn't have the power to do it. You understand why I raise it, but on its own terms, you cited to the district judge, did you not, a case that the district judge himself actually used departure language rather than variance language, right? You said, hey, judge, you've done it yourself. You've departed downward. You should depart here, too. How can we say, even if we get over the issue, that it wasn't timely raised in the blue brief, that the judge didn't understand his power, even if he used the terms variance and departure kind of interchangeably? Well, I think we need to consider it as a whole. Had he considered the acceptance and understood his ability to be able to reduce the entire three levels, the sentence would have been substantially less than the sentence that was pronounced on Mr. Gariblanco. Right, but you have to assert that he did not know that he could depart. That was the error. Or he didn't understand the full knowledge of what he could do. I don't know if did it know was the... Well, he knew he could vary. Absolutely. When we talk about variance, we're talking about taking into account a fact or a circumstance not considered by the sentencing commission and not embodied in the sentencing guidelines. When we're talking about a departure, we're talking about something that specifically goes to something actually in the guidelines themselves, right? Yes, sir. So he could vary, he could depart, he could do both. In this case, he thought it was worth 48 months. Yes. Putting the whole thing together. Right. Was he obliged to give more than that? I don't know if he's obliged, but we do believe that he should have taken into consideration and given him the full three levels for the acceptance of responsibility. Oh, but he does say that he considered the fact that he wasn't getting any credit for the acceptance of responsibility because if you started with a sentence level 37, which was 360 months to life, even if you took three levels off it, it still was above the mandatory maximum of 240 months. So he considered that. And he said that was unfair and he should get credit for it and specifically said, I'm giving him credit for that along with these other mitigation factors. I mean, that's what he says. He did. He put it all together and based on that, gave a sentence that he thought was appropriate under the circumstances. Okay, Ms. Avita, thank you very much. We'll have you come back with your full time for rebuttal. Mr. Dion. Morning, Your Honors. May it please the Court. Scott Dion on behalf of the United States. Appellant's sentence should be affirmed for three reasons. First, there was no proper agreement violation. The government did not use any of his statements against him as evidence. The proper agreement only prohibited statements that he made during the debriefing to be used against him as evidence in a government case. What do we do with the email from the trial prosecutor to Ms. Avita about the understanding concerning whatever was obtained from the prosecutor's search after the password was provided? I think there's two things. First, the email is an extrinsic piece of evidence that shouldn't be considered because it's outside the four corners of the proper agreement and proper agreements are contracts. Isn't it an addendum to the proper agreement? I don't believe so. It doesn't say that in the proper agreement. Who drafted the proper agreement? The prosecutor, the government. And who sent the email to Ms. Avita? The government. And both things, whatever their ultimate effect, set out, you're right that the proper agreement itself looks to be an agreement that does not provide derivative use immunity. But that email is really, really difficult for you. Now, there may not be a violation at all, but to say that the email is just not part of this thing, that doesn't make much sense to me. A prosecutor and a defense lawyer and a client enter into a proper agreement and right before one of the critical things is going to happen, which is the turnover of the passwords,  and that information derived from the computer won't be used against him, unless, of course, it meets this, quote-unquote, violent exception from the proper agreement. I don't see how you can't consider that. Yeah, I don't think that's exactly what the email said. Okay, tell me what the email says. It says that the letter covers what might be found on the devices and, frankly, it's not clear from the email and the record's not sufficient enough to tell what covers means. I mean, it appears from your face that you assume that it means. Aren't proper agreements supposed to be interpreted against the government who is the drafter? Sure, and the four corners of the proper agreement, like you said. Okay, well, but if derivative use immunity does not apply to whatever is obtained from the computer, period, no matter what the content is, what's the purpose of the email? The purpose of the email, and perhaps it was inartfully drafted, the purpose of the email was to just summarize what was being attached. What was actually signed had a merger clause which said there were no additional promises made, including conversations, statements made before that that maybe aren't on the record. That includes the email, though. There are no additional promises made beyond the four corners of the agreement, which clearly had a derivative use exception. In any event, even assuming arguendo, there's a castigo violation. The district judge tells us unambiguously, even without the video, there's more than enough evidence to meet the burden in the case. Doesn't that resolve the issue? It does, Your Honor, and that's an argument we've made in the briefs. Putting aside the issue with the proffer agreement, the only evidence that the government tried to rely on that was questioned by the appellant was attribution evidence attributing him to subtitling this death threat video. Putting that evidence aside, there was ample evidence on the record to support the terrorism enhancement. That includes, of course, open-source Jihad 1 and 2. That harmless error argument, of course, depends on there being sufficient evidence aside from the information derived from the computer to uphold the terrorism enhancement. Can you walk us through how the other pieces of evidence satisfy the terrorism enhancement under our precedent? Sure. There's two pieces of evidence that the district court mainly relied on. That was open-source Jihad 1 and open-source Jihad 2. Those were government exhibits 1 and 2 introduced during sentencing. Open-source Jihad 1 described how to make a bomb, a homemade bomb at home. It described the manual as America's worst nightmare. It talked about causing damage to the enemy, Western governments that are waging a relentless war against Islam. And it talked about striking back at the enemy. Open-source Jihad 2, maybe in clearer terms, said the idea of mowing down civilians with a pickup truck could be implemented, and this is a quote, could be implemented in countries like Israel, the United States, Britain, et cetera, where the government is in support of the Israeli occupation of Palestine, the American invasion of Afghanistan and Iraq, or countries that had a prominent role in the defamation of Muhammad. So these were manuals that were produced to allow lone wolf jihadists to commit terrorist attacks in retaliation for things like their perceived view that Israel is occupying Palestine. Apart from that, and this court can affirm on the record, and there's plenty of other record evidence I can run through, there are undisputed facts in the PSI in which the appellant, in response to one of his affiliates being arrested in Spain, produced and released a video threatening terrorist attacks against the Spanish National Police. I mean, if that's not retaliation against a government, I'm not sure what is. That was in response to the arrest of a Mujtaba media affiliate. And then he released another video threatening terror attacks in Madrid. The video had footage of Christmas celebrations in a public square and stated, quote, don't let them celebrate in peace, and quote, kill them, give them jihad. And as a result of that, there was a tangible effect as a result of that video that he produced and disseminated, which was that the event was canceled. And so there's plenty of other evidence on the record, but Government's Exhibit 1 and 2, Open Source Jihad 1 and 2, suffice on their own to show, along with, of course, the factual proffer, suffice on their own to show that this defendant, this appellant, committed these crimes in an effort to retaliate against government conduct. And as Judge Marcus indicated in his colloquy with Ms. DeVita, the district judge said expressly that he was making the finding that the terrorism enhancement applied, even without the disputed document that came from the computer after the password had been provided. Correct. So really the only question before the court is whether that was a clearly erroneous finding. Based on the record that I just ran through, it is not. Can we talk about the acceptance of responsibility issue at some point before you sit down? Sure, I'm happy to talk about that now. I think I covered most of the record in support of the terrorism enhancement. So the acceptance of responsibility, as the panel observed, this was actually taken into account in the form of a variance at sentencing. Let me ask the question sharply and directly. I know it wasn't raised in the blue brief, and I know it was only raised in the reply brief, and you may argue that the issue was abandoned. But let's hold that aside for a second and assume she had said in the blue brief what she said in the gray brief. I understand the argument. It is that the judge misapprehended his power. He labored under the wrong and false assumption that he could only vary downward based upon the acceptance of responsibility, not that he could depart downward. And that was a big deal, because if he had properly recognized that he could depart downward, and he chose to depart downward from the level there, if he started with 240 months, 210 to 262 would have been the range. It would have taken him three levels down. The departure would have taken him to 151 to 188 months before you got to the variance based on health and those things. And by misapprehending that, he basically lumped together what fell under the category of departure with something that fairly fell under the category of variance. And we've got case law that says, you cited it, that if the judge misunderstands what his power is, if he doesn't recognize that he has the power to depart, that's error and you've got to send it back. That's her argument, if I understand it. What am I missing? Why isn't that a good argument here? Like you said, that was raised for the first time. Okay, so the first issue was it was abandoned. But let's suppose we go to the merits. Did the judge misapprehend his power? The reason I raise it is when I read this record, the answer is not altogether clear to me. He uses the language variance on two equations, not departure, and he lumps the whole thing together under the variance. On the other hand, presumably he knew he had the power to depart because counsel for the defendant actually cited to one of his cases where he did depart and used the right label for what he was doing. On the other hand, he says in response to the defense counsel, wouldn't that be a variance request? I don't think that's a calculation. That's an argument why there should be a variance because he's not effectively getting the value of it. The way the guidelines work out, so it's warranting a variance. He says that twice. On the other hand, departure variance, pretty close. It's a way of bringing the sentence down. I'm just asking, is there enough in this record to suggest the trial judge misapprehended his power? No, and I think your second point is actually really important. There was no requirement that the judge, even if he was operating under the departure guidelines, there was no requirement that he take three steps down from the lowest possible guideline range that encompassed the statutory maximum. That wasn't a requirement under Rodriguez, and that's not a requirement under the guidelines. If he departed, if he operated as a departure, he could just sentence below the guidelines, which was 240 months. In reality, the difference between a variance and a departure... I think her point would be all of that is true. He wasn't required to depart at all. If he chose to depart, he wasn't required to depart three levels. He could have departed one or two. Her point is he misunderstood. He didn't realize that he had the power to depart three levels. He labored under the assumption it was just a circumstance not properly taken into account. I'm not sure that's... As you said, the appellant cited a prior district court case in which he presided over, among many others. It's not clear that Judge Scola didn't know that he could or could not depart. He obviously knows how to depart, so we can assume maybe that he chose not to depart and then just treated this as a variance. Yeah, and I cited a case in my brief which says the presumption is that a judge understands unless there's something to indicate otherwise. There's nothing here to indicate otherwise. In fact, like I was saying... Well, there is something to indicate otherwise. I read it to you. The trial judge says when the defense counsel asked about acceptance of responsibility, and the trial judge framed it in terms of departure, the district judge said, quote, wouldn't that be a variance request? I don't think that's a calculation, obviously referencing a departure. That's an argument why there should be a variance because he's not effectively getting the value of it. And then the court says a second time, the way the guidelines have worked out, he doesn't really get credit for acceptance of responsibility, so it is warranting a variance from the guideline range. So he rejects departure, language sort of coming out of the defense lawyer, and says, no, I think it's a variance. I'm just asking the question. She didn't raise it. It's gone with the wind. But if she had raised it, and we could, I suppose, consider it even if she didn't, does it show some misapprehension? I don't think so. I mean, it was clear from the beginning that Appellant was asking for a departure. He filed a departure motion. He made it clear at sentencing. We, the government, in our response said, sure, under Rodriguez, the court has authority to depart. So all the pleadings leading up to this made it clear that the court can depart. The court presided over a case in which it did depart. And the Appellant cited, of course, plenty of other cases in which district courts have departed. The second part of this is that it's not clear what the difference would have been, because like I was saying, there's no requirement that the court depart in a certain way. It's just that under Rodriguez, pre-Booker, the court could have departed from the guideline range. And that could be in the form of what Appellant's asking, three steps below the statutory maximum guideline range, or it could be just similar to a variance, a sentence below the guidelines. And so either way, it's not clear that that would have really made a difference. But I think from the record, the district court did understand its authority to depart. It was stated several times in pleadings. It was stated, again, at sentencing, and again during sentencing. So I think for all those reasons, the court understood its authority. And like, as you mentioned, this wasn't an argument that was sufficiently raised in the opening brief to begin with, and so it was abandoned. For all these reasons, we respectfully ask that you affirm the district court sentence. All right, Mr. Dionne, thank you very much. Thank you. We believe that while this court has said that we may have waived the issue having to do with the judge not clearly understanding his right to depart, we think that in our reply brief, we clarified it. I, with all respect, do not agree that we waived it. I think that we may have not eloquently stated our position. We, at several times in the government conceded, mentioned to the court and addressed the court with the fact that we wanted a departure for the acceptance of responsibility. Ms. DeVita, let's assume that you're right, that the issue is properly before us. Rodriguez gets decided at a time when the sentencing guidelines are mandatory, right? Yes, sir. So it speaks of departure because that is, at the time, the only mechanism available to a district court to go away from whatever the guidelines produce as a sentencing range. But now, we're in a post-Booker world and district judges can usually achieve through a variance what they can achieve through a departure. So what's the problem? If he had varied three levels, as you requested in your blue brief, instead of departed, would he have committed an error? If he had not departed specifically for the acceptance of responsibility. No, no, no. I'm changing the facts. You say, I want a three-level departure for acceptance of responsibility to bring us down to 151 to 188. Yes, sir. The judge says, I hear you. I am varying down three levels. I decline to depart, but I am varying down three levels. Would he have committed error? Well, it may have not. It may have been harmless error at this point, but I . . . So you can't vary for acceptance of responsibility. You have to do a structured departure within the guidelines and Rodriguez. Well, the way that it states now, the way that the law based on this circuit exists, it needs to be a departure. That's what the court has said in Rodriguez. If he had given you a three-level variance for acceptance of responsibility, he would have committed reversible error. I think it would have been harmless error. I don't know if it would have been reversible. We wouldn't be here arguing that issue if he had, in fact, given three levels off for acceptance of responsibility off the 240 months. We wouldn't be here. We wouldn't be here if he had given it to him for acceptance of responsibility. Let me ask you a question, though. It's a comment Mr. Dion made. In fairness to the district judge, if you look at what was argued in the district court, if you look at the briefs, your brief said, give him a departure of three levels because he didn't get credit for acceptance of responsibility. The government came back and said, yes, you have the power to do that if you choose to depart under Rodriguez, but you need not and ought not to because of A, B, and C. And then we had the entire sentence colloquy, including your citation to a particular case where the judge expressly departed in a different matter with a different defendant. How do we conclude from all of that that the judge really labored under a misapprehension? Everybody called it a departure. He lumped it together under the loose heading of a variance. So what? Does that show misapprehension? Well, I think it's not clear what the district court was thinking. I think that the court needs to consider it as a whole. The fact that defense counsel and the government referred to it as a departure, but the district court judge erroneously described it as a variance is something that should at least advise this court that there was some sort of misapprehension. Let me ask the question this way. Did you say to the district judge, Wait a minute, Judge Scola, you've made a mistake. You've characterized this as a variance, but it's not a variance. It really is a departure. And if you calculate it as a departure, you'll come out perhaps, or you could come out with a different result. Did you flag the issue? I didn't, but I did at the end of the sentencing object to the court's decision and specifically state that we believe that the court had erred in not giving him the... Right, but you never said to the judge, You used the wrong nomenclature. You used the wrong verb. You said it was a variance. It's really a departure. You didn't help him in any way with that. I did not, Judge. In all honesty, I didn't think that it was my position to correct his wordings and jump up and say... Well, but your argument now is the misapprehension yielded this error, which should lead this court to vacate the sentence, send it back, and say, Do it again. You understand you have the power to depart, but you don't have to. But you didn't say that to him at the time is all I'm saying. I did not, Judge, but I am bringing it to this court's attention as the reviewer. Judge, just to close up, we do believe that the court erred in not granting us a cast-cigar hearing. We had witnesses that we would have presented at that hearing that we did not have an opportunity to. We do believe, like this court has stated, that the emails between the parties was an addendum, and it was definitely part and parcel of the agreement. It can't be excluded like the government would like, Your Honor, to believe. And lastly, we believe that the information that was presented was not sufficient to specifically comply with the second prong of the 12-level enhancement in that it did not show specific intent for retaliation or coercion of the government. Before you sit down, what's your best case on that position? I think our best case is the Stewart case, and I can cite that for you. It's a Second Circuit Court of Appeals case. It is at 590 F. 3rd 93. I do also believe that this court, when it ruled in the case of Arcila v. Ramirez, its first decision is on point. I think its second decision, which now is currently waiting for a hearing on an on-bank rehearing. And I can give you all the details. Arcila Ramirez that I argued before this court. I have Arcila. What's the on-bank one? The on-bank one is Arcila had two different decisions. It had the original decision where the court had oral argument, and then subsequent to that we went back for resentencing, and then the court issued another decision after that. That's the one that is currently pending a rehearing on-bank by this court, which we believe was obviously decided erroneously. All right. Thank you very much. Thank you very much for the court's time. Have a wonderful day.